KAEISHA COLBERT-GREEN,

      Plaintiff,

v.

NATIONAL WHOLESALE LIQUIDATORS,
INC.,

      Defendant.

_____/

Case No. 06-13242

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [22]**

This employment dispute comes before the Court on Defendant National Wholesale Liquidators, Inc. ("National")'s motion for summary judgment. Plaintiff's complaint alleges claims of hostile work environment sexual harassment, quid pro quo sexual harassment, retaliation, and religious discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.*, and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws §§ 37.2101, *et seq.*

For the reasons set forth below, National's motion is GRANTED as to Plaintiff's claims of (1) hostile environment sexual harassment attributed to co-worker Issouf Doukoure and supervisor Sow; (2) quid pro quo sexual harassment attributed to co-worker Doukoure and supervisor Sow; (3) retaliation attributed to co-worker Issouf Doukoure; and (4) religious accommodation. Because genuine issues of material fact exist, National's motion is DENIED as to Plaintiff's remaining claims of (1) retaliation attributed to supervisor Sow in

connection with disciplinary action taken against Plaintiff beginning on December 15, 2004; and (2) intentional religious discrimination by supervisor Sow.

## I.    Facts

### A.  Defendant National

National operates a chain of discount retail stores throughout the United States, including the Bel Aire (Store No. 56) and Northland (Store No. 55) stores in Michigan. (Pidgeon Decl. ¶ 2.)  National's stores are typically open seven days a week.  (Pidgeon Decl. ¶ 5.)  The Bel Aire store opened in November 2004.  (Allen Dep. at 8.)  Abdoulawe Ishmail Sow ("Sow") was its General Manager during the November 2004 - February 2005 time period at issue here.  (Sow Dep. at 18.)  Sow was the sole employee at that store with the authority to hire and fire employees.  (Allen Dep. at 22-24; Doukoure Dep. at 11, 22; Pidgeon Dep. at 14; Pidgeon Decl. ¶ 8; Sow Dep. at 23.)  During that same time period, there were also three Assistant Managers:  Betty Allen, Tracey Childress, and Keith Steward; Felicia Taylor worked as a bookkeeper; and Marquita Smith was a Head Cashier. (Allen Dep. at 8, 11-15, 35-36.)  Issouf Doukoure was a stock employee with no authority to hire, fire, or discipline other employees.  (Pidgeon Decl. ¶ 8; Pidgeon Dep. at 36; Allen Dep. at 23-24; Doukoure Dep. 21-22.)

National has written policies addressing equal employment opportunities, sexual or other harassment in the workplace, and retaliation against employees who report alleged discrimination.  Specifically, its policy prohibits harassment and instructs employees to report alleged violations to its Director of Human Resources, Robert Pidgeon, or any other management official with whom the employee feels comfortable.  These policies are included in the Employee Handbook given to all new employees, including Plaintiff.  The

2

written policies provide Mr. Pidgeon's office, cell, and home phone numbers. Employees are instructed that, if "unsure of whom to raise an issue of harassment," or if the employee has "not received a satisfactory response within five (5) business days after reporting the incident" perceived to be harassment, then the employee should immediately contact National's President, Scott Rosen, "who will insure than an investigation is immediately conducted." (Ex. A to Pidgeon Decl.)

### B. Plaintiff's Employment History

On November 8, 2004, Plaintiff was hired to work as a cashier at National's Bel Aire store. (Plf.'s Dep. at 38; Pidgeon Decl ¶ 4.) Plaintiff worked at National for a little over three months; from early November, 2004 until early February, 2005. (Plf.'s Ex. I, Time Sheets.) When hired, Plaintiff received a copy of National's Employee Handbook. (Plf.'s Dep. at 43.) As set out in the Handbook, employees are expected to report for scheduled shifts on time and to notify a store manager one hour before that scheduled time if they are unable to work or going to be late. Employees are also informed that failure to do this subjects them to disciplinary action, including possible termination. (Pidgeon Decl. ¶ 5 and Ex. C, Employee Handbook.)

#### 1. December 15, 2004 Discipline and Alleged Sexual Harassment

On December 15, 2004, Plaintiff received a written warning from Sow for failing to punch out when she went to lunch. (Plf.'s Ex. J at 1.) Plaintiff does not dispute this. (Plf.'s Dep. at 48.) She explains, however, that she did not punch out because she brought back lunch for Store Manager Sow, Assistant Managers Tracey Childress and Keith Steward, and Issouf Doukoure. (Plf.'s Dep. at 49.) The write-up warned that if Plaintiff did this again,

she could be suspended.  (Plf.'s Ex. J at 1.)  Plaintiff refused to sign the disciplinary action form.  (*Id.*)

On December 15, 2004, Plaintiff alleges, she was sexually harassed by both Store Manager Sow and co-worker Doukoure around 1:00 or 2:00 p.m., testifying as follows. While she was on a ladder and Doukoure was handing her dolls to put on a tall shelf, Doukoure grabbed her "in between" her vagina and her "rear end," commenting to her that "All this is what I've been missing" and that her husband "wasn't hitting it right."  (Plf.'s Dep. at 51-52, 65, 67-69.)  After regaining her balance, she came down from the ladder while swearing at Doukoure, who just laughed.  Another co-worker, Derrick Green, heard some commotion, and came over to Plaintiff.  She tried to explain to Derrick what had happened. Derrick Green told Plaintiff that he only saw her jerk her body and stumble on the ladder.[1] (*Id.* at 69-70.)  No one else saw anything.  (*Id.*)

Plaintiff then went to the store office to complain.  Store Manager Sow came to the door, and she explained what Doukoure had done and said to her.  Sow then told her "Your man can't handle all of that ass" and told her that she "needed to come to their hotel" because she "can't do one without doing the other."  (Plf.'s Dep. at 66.)  No one else was present or heard Sow's comments to Plaintiff.  (*Id.*)  She was shocked by Sow's comment, and asked him if he was serious.  After getting no response, she started crying, went to her locker, got her stuff, and went home.  (*Id.* at 66-67.)

At her deposition, Plaintiff testified that she did not know what time of day Sow gave her the write-up but that it "was after the incident" with Doukoure.  (Plf.'s Dep. at 51-52.)

---

[1]Plaintiff presents no deposition testimony or affidavit signed by Derrick Green.

Thus, the actual timing of the disciplinary action and alleged sexual harassment is in dispute.

As soon as Plaintiff left her job on December 15, 2004, she called National's Human Resources Director, Robert Pidgeon, at his office. She left a message, and Mr. Pidgeon called her back at her home that same day. Plaintiff told him all that had happened with Doukoure and Sow. Mr. Pidgeon expressed surprise, asked Plaintiff if she was okay, and then told her that he would investigate and call her back. Mr. Pidgeon called her back around 7:00 p.m. that same day. He asked Plaintiff what she wanted him to do. Plaintiff told him that she did not want to work with Doukoure anymore. In response to Mr. Pidgeon's inquiry whether she wanted to be transferred, Plaintiff stated "No, that wouldn't be fair." She told him that the Bel Aire store was closer to her home. She also asked for a few days off work and Mr. Pidgeon gave his permission. (Plf.'s Dep. at 70-74.) Plaintiff also told Mr. Pidgeon that she had gone to the police and was waiting for a detective to call her. (*Id.* at 73.)

Mr. Pidgeon's testimony is as follows. He got a phone message from Plaintiff and returned the call. Plaintiff told him that Doukoure had touched her behind and had said something inappropriate to her. She did not tell Pidgeon that Doukoure had previously made other comments of a sexual nature to her. He told Plaintiff that he would look into it and call her back later that day. (Pidgeon Dep. at 20-21; Pidgeon Decl. ¶ 7; Plf. Dep. at 80.) Plaintiff told Pidgeon that she had made a charge against Doukoure with the police, and he told her to keep him apprised of those charges. Pidgeon also conveyed this information to Doukoure and told him that he would be terminated if he was arrested or charged. (Pidgeon Dep. 40-41.)

Pidgeon treated Plaintiff's call as a sexual harassment complaint against Doukoure. That same day, he spoke with Store Manager Sow several times. Pidgeon told Sow that he did not want Doukoure working at the store and instructed Sow to send him home. The following day, Doukoure was transferred to another store pending Pidgeon's investigation of Plaintiff's allegations. Pidgeon wanted to immediately remove Doukoure from the same job site where Plaintiff worked. Pidgeon informed Sow that Plaintiff had asked for a few days off and that he had granted her request. He told Sow that he would be coming to the store personally to investigate and instructed Sow not to talk to anyone about the incident. Pidgeon cannot recall the specific date but believes he began his investigation in Michigan the following week. (Pidgeon Dep. at 22-25.) During his investigation, Pidgeon interviewed Doukoure, who was now at a different store, and he denied everything. Pidgeon also interviewed Derrick Green, who told him that he did not hear or see anything other than Plaintiff coming off the ladder and that she appeared to be startled for a second as if she had slipped. Pidgeon then interviewed Store Manager Sow and Assistant Managers Betty Allen and Keith Stewart. (Allen denies that she was interviewed, Dep. at 29.) All were aware that Plaintiff had made allegations of sexual harassment against Doukoure but knew nothing and had not heard any other complaints of this nature involving Doukoure. Other than Plaintiff's complaint, Pidgeon was unaware of any allegations of inappropriate conduct against Doukoure. At the end of his investigation, Pidgeon called Plaintiff. He told her that he could not reasonably conclude what exactly happened, but to be on the safe side would make Doukoure's transfer to the Northland store permanent. He had previously offered, and she had declined his offer to transfer her out of the Bel Aire store. He specifically asked her if she had any problem coming back to work at the Bel Aire store and she said

6

that she did not. (Pidgeon Dep. at 26-35, 37-38, 46.) At no time during Plaintiff's discussions with Pidgeon did she tell him that Doukoure had previously made other comments of a sexual nature to her. (Pidgeon Decl. ¶ 7.)

Doukoure's temporary transfer to the Northland store was made permanent, and Plaintiff's sexual harassment allegations were recorded in his personnel file. (Pidgeon Dep. at 52-54.) At the close of this investigation, Pidgeon advised Plaintiff to contact him if she had any more difficulties working at the Bel Aire store. After Doukoure's transfer, Plaintiff did not report to Pidgeon any additional claims of harassment, discrimination, or retaliation. (Pidgeon Decl. ¶ 9.)

Store Manager Sow denies that Plaintiff ever came to his office to complain about Doukoure on December 15, 2004 or any other time. Sow also denies that he made the sexual comments to her that she claims he did. (Sow Dep. at 43-44, 51-52.) Rather, Sow testifies that he first learned of Plaintiff's complaints about Doukoure in a telephone call from Mr. Pidgeon. He told Mr. Pidgeon that he was not aware of Plaintiff's allegations. Mr. Pidgeon then stated that he would be coming to Michigan to investigate the matter, and he did so a short time later. (Sow Dep. at 36-41.) Sow denies being angry with Plaintiff for reporting the alleged sexual harassment by Doukoure to Mr. Pidgeon rather than contacting him. (Sow Dep. at 54-55.) Pidgeon testified that he was unaware of any complaints of inappropriate conduct against Store Manager Sow. (Pidgeon Dep. at 46.)

Doukoure's testimony about the alleged December 15, 2004 incident is as follows. He denies that he inappropriately touched Plaintiff or made sexual comments to her. (Doukoure Dep. at 34-35.) He recalls that on December 15, 2004, he was working in the toy department stocking the shelves with Derrick Green and Keith Steward. Plaintiff was

7

also working in the area. It was time to go to lunch, and Plaintiff went with Keith Steward to buy the food without clocking out as required for employees. When Plaintiff got back, Store Manager Sow asked her where she was. When she told him she went out for lunch, Sow wrote her up because she did not punch out first. Doukoure was working in Sow's office when Sow asked Plaintiff why she went to lunch without punching out, but he did not see Sow actually write her up. Keith Steward may also have been present in the office. Shortly thereafter, Doukoure heard from an employee that Plaintiff was in the break room crying because she had gotten written up. Doukoure learned from Keith Steward that Sow had written Plaintiff up. (Doukoure Dep. at 36-41.)

Doukoure first learned about Plaintiff's sexual harassment allegations against him the next day when he was on his way to work. Sow was driving him to work and they had stopped to get the tire on Sow's car repaired. Sow got a call on his cell phone from Pidgeon. Sow told him that Plaintiff told Pidgeon that Doukoure had touched her. (Doukoure Dep. 42-43.) As the day went on, Doukoure heard rumors that Plaintiff was making allegations against Sow and Keith Steward too. The first thing he heard, however, was that it was just him – that she claimed that he had touched her. (*Id.* at 43.) After Sow talked with Pidgeon on the cell phone, Sow told Doukoure that he could not go to work that day because of Plaintiff's allegation. He did not go to work and did not get paid. He never went back to the Bel Aire store while Plaintiff was working there. (*Id.*) He was transferred to the Northland store the very next day by National's District Manager, Meldoun Sy. (*Id.* at 43-44, 46-47.) Mr. Sy told him that he was being transferred because of the allegations made by Plaintiff and instructed him not to go to the Bel Aire store. (*Id.* at 44.) Doukoure does not remember speaking with Pidgeon about Plaintiff's allegations. (*Id.* at 45-46.)

Doukoure denies that he ever told Sow to terminate Plaintiff.  He denies that Sow ever told him that he was going to terminate Plaintiff because of the allegations she made against Doukoure or that it was one of the reasons why she was terminated.  After Doukoure was transferred to the Northland store, he was not apprised of Plaintiff's subsequent job performance at the Bel Aire store and had not seen any of her disciplinary write-ups.  (Doukoure Dep. at 50-53.)

### 2.  Other Disciplinary Action Against Plaintiff

On December 22, 2004, Store Manager Sow wrote Plaintiff up again because, although she was done with her shift, she waited for her ride to arrive before punching out.  Plaintiff was warned that her next violation could result in a suspension.  (Plf.'s Ex. J at 2.)  Plaintiff signed the discipline form and concedes that she did what is alleged but explains that it was not intentional.  Rather, she forgot to punch out and came in to do so when she remembered.  (Plf.'s Dep. at 52-53.)

On December 30, 2004, Plaintiff received another written discipline from the Bookkeeper, Felicia Taylor, stating that "cashier left work place without permission, went to restroom, stayed away from register for substantial amount of time, cashier constantly being told same thing over (Don't leave work station without permission)."  (Plf.'s Ex. J at 3.)  Plaintiff refused to sign this form.  (*Id.*)  As a Bookkeeper, Ms. Taylor had the authority to execute disciplinary write-ups.  (Allen Dep. at 36.)

Plaintiff objected to the fact that she was placed on a cash register with a camera and was paged whenever she moved out of camera view.  She conceded that she did leave her register and was in the restroom for five to ten minutes.  Plaintiff felt that the write-up was unfair.  Ms. Taylor told Plaintiff that Store Manager Sow would be "mad" that she refused

to sign the discipline form. (Plf.'s Dep. at 54-55.) Assistant Manager Tracey Childress was present when Felicia Taylor gave Plaintiff the write-up. He told Plaintiff, "You know why they're picking on you. Just do what they tell you to do." (*Id.* at 56.) Plaintiff replied, "I'm not going to be treated unfair because the people they hired can't keep their hands to themselves." (*Id.*) Tracey Childress said no more, and Plaintiff went home. Plaintiff denies that she was suspended at that time. (*Id.* at 57.) She claims she worked her entire shift. (*Id.* at 58-59.)

### 3. Final Disciplinary Action and Alleged Religious Discrimination

On January 31, 2005, Plaintiff received her final written discipline. It was signed by Head Cashier, Marquita Smith, and stated that Plaintiff was scheduled for work on Sunday, January 30, 2005, but she did not report for work. It further states that Plaintiff was asked to provide work with her school schedule, but she failed to do so. (Plf.'s Ex. J at 4.) Plaintiff refused to sign the form, writing that she had spoken with Store Manager Sow and there was a mutual agreement between the two of them that, because of her school schedule, she needed weekends off. Plaintiff also wrote that "because of previous incidents Ismail [Sow] is trying to give me a bad time in the work place." (*Id.*) Assistant Manager Betty Allen was present when Plaintiff was given this write-up. (Plf.'s Dep. at 63.)

At her deposition, Plaintiff testified that she had a discussion with Sow on Saturday, January 29, 2005, telling him that she wanted her Sundays off to do homework. Sow had suggested that she come into work after her Sunday church services, and Plaintiff refused because she wanted time on Sundays to do her homework for her GED. Sow told her that everyone works on Sundays, and Plaintiff told him that she would not. (Plf.'s Dep. at 60-61.)

10

On her employment application, Plaintiff marked that she wanted Sundays off, and she testified that, at the time of her job interview, she told Assistant Manager Keith Steward that she did not want to work on Sundays because that is when she goes to church and after that wants to spend time with her family. (Plf.'s Dep. at 40-41.) Plaintiff concedes, however, that she worked Sunday, December 5, 2004 from 3:30 p.m. to 10:08 p.m., and again on Sunday, December 12, 2004 from 3:44 p.m. to 10:21 p.m. (Plf.'s Dep. at 46-47.) She also conceded that she worked Sundays for other employers; namely, Marshall's and Footlocker. (Plf.'s Dep. at 22-23, 31-32.)

Plaintiff did not show up for work on Sunday and did not call in. Plaintiff testifies that Sow told her that he would change the schedule to reflect that she was not working on Sunday and asked her to bring in her school schedule. Plaintiff replied that her "school schedule doesn't have anything to do with my Sunday, if I bring you a school schedule it doesn't say Sunday." (*Id.* at 62.) Plaintiff also testified that she did not tell Sow that she did not have a school schedule. She did not feel she had to tell him that because she did not work on Sundays. (*Id.* at 63.)

Plaintiff was suspended for not showing up for work on Sunday, January 30, 2005, and claims she never returned to work after Monday, January 31, 2005. (Plf.'s Dep. at 63-64.) Her work records, however, show that she worked on Wednesday, February 2, 2005, from 8:43 a.m. to 12:33 p.m. (Plf.'s Ex. I.)

Plaintiff testified that on her last day of work at the end of her shift, there was one meeting with Store Manager Sow and Assistant Manager Betty Allen where Sow asked her why she did not bring in her school schedule. Sow told Plaintiff that he needed her school schedule to verify why Plaintiff could not work on a Sunday. Plaintiff then told Sow that she

had informed the Bel Aire store staff when she hired in that she did not work on Sundays because she goes to church, spends time with her family, and does her homework. Sow then asked her if she could work a few hours on Sundays after going to church, and she refused. Sow told her that it was important if she wanted to keep her job. Plaintiff replied that he could not make her choose. She testifies that Sow then said, "You need to choose between your God and who's going to pay your bills, your God or your job." After that comment, Plaintiff left the store and went home. (Plf.'s Dep. at 82-83.) Plaintiff claims that she never spoke to Assistant Manager Betty Allen that day but does recall that she sat in on the meeting with Sow. (*Id.* at 84.)

Sow and Allen have different recollections of these meetings. Before the his last meeting with Plaintiff, Sow recalls asking Plaintiff to bring in her school schedule at least twice so that he could schedule her to work on the weekend. (Sow Dep. at 32-33, 35-36, 42, 59-62.) She never brought it in. (Sow Dep. at 41.) Sow understood that Plaintiff was taking classes at home via her computer. (Sow Dep. at 61.) Plaintiff told Sow that she could not work on Sunday because of school. She did not mention church. (Sow Dep. 34, 50.) Sow denies that he told Plaintiff that she must choose between God or her job. (Sow Dep. at 52.)

Sow concedes that he was the person who decided to terminate Plaintiff, and he did so after first obtaining Pidgeon's approval. (Sow Dep. at 44-45.) The decision was made because Plaintiff failed to follow store rules despite prior written warnings. (Sow Dep. at 46-50.) Sow testified that he told Plaintiff that she was suspended and sent her home but did not tell her that she was terminated. (Sow Dep. at 52-53.) He believes that Assistant Manager Betty Allen was present during this discussion. (Sow Dep. at 53.)

Assistant Manager Betty Allen testified that she never head Sow or Doukoure make any comments of a religious or sexual nature and is not aware of any other harassment claims against them. (Allen Dep. at 30, 65.) Allen also testified that Sow never told her or anyone else at the Bel Aire store to keep an eye Plaintiff. (Allen Dep. at 67.)

As to Plaintiff's last day at the Bel Aire store, Allen testified that she was present for two meetings between Sow and Plaintiff. As to the first meeting, Sow had Allen come to his office before he called Plaintiff in over the loudspeaker. Allen had no prior knowledge what the meeting was about. Once in Sow's office, Plaintiff was asked about taking a 30 minute lunch when she told the Head Cashier, Marquita Smith, that she was going to take a 15 minute break. Marquita Smith had reported this to Sow and Sow was now discussing it with Plaintiff in Allen's presence. Plaintiff responded that she went to get lunch from Subway but the line was long and so she was gone 30 minutes instead of 15. Sow then pulled out Plaintiff's file, discussed her the disciplinary write-ups, and told her that her job performance was not as it should be. He commented that she should not have to be called back to her register every 15 to 20 minutes. (Allen Dep. 36-41.) He then questioned her why she failed to show up for work the previous Sunday. Plaintiff told Sow that she goes to school on Sundays, and Sow told her that he is running a business and has to schedule according to his needs. Sow told Plaintiff that if she goes to school, she needs to show him proof so that he can work around it. Plaintiff told Sow she would provide him with a schedule. When Plaintiff told Sow that he was just picking on her, Sow responded that he is running a business. (Allen Dep. at 42.) At the end of this first meeting, Plaintiff agreed that she would follow all the work rules.

Later that same day around 2:00 or 3:00 p.m., Allen was present when Sow once again called Plaintiff into his office. This second meeting was held because Plaintiff was called three times to come back to her register and she did not do so. Sow questioned Plaintiff again about leaving her register unattended. In response to Plaintiff's claim that Sow was always picking on her, Sow assured her that he was not. It was during this second meeting that Plaintiff was terminated. Mr. Sow opened up Plaintiff's file, which was still on his desk from the earlier meeting, and pulled out all of her write-ups. He read them to Plaintiff. He then called Mr. Pidgeon while Plaintiff was in the office. Allen heard Sow tell Pidgeon that Plaintiff had so many write-ups, that she kept leaving her register, failed to punch out when she should, and did not show up for work on a scheduled Sunday. After Sow finished speaking with Pidgeon over the telephone, Sow terminated Plaintiff. Allen does not recall what Sow said to Plaintiff. She does not recall if Plaintiff was suspended before she was terminated. After she was terminated, Plaintiff left. (Allen Dep. at 42-53, 55-56, 68-71.) Allen later prepared a written statement about this meeting at Mr. Pidgeon's and Store Manager Sow's request, detailing all that she had witnessed at the meeting between Sow and Plaintiff which she recorded as occurring on February 4, 2005. (Allen Dep. at 56-65, 71-72.)

### 4. Alleged Sexual Harassment by Doukoure Before December 15, 2004

Plaintiff testified at her deposition that December 15, 2004 was the first time Doukoure touched her. About a month after her November 8, 2004 start date, which would be December 8, 2004, Plaintiff alleges that Doukoure began talking nasty about her behind and telling her that she had a big ass, that her vagina was fat, and asked her if she was

14

going to give him some pussy.  (Plf.'s Dep. at 76-80.)  One of these comments was overheard by co-worker Nicole Pye.  Plaintiff also testified that she reported these pre-December 15, 2004 comments to Assistant Manager Tracey Childress.  He appeared shocked and replied, "If I take a write-up to Ishmail [Sow], you already know he's not going to do anything."  (Plf.'s Dep. at 78-79.)  Plaintiff believed that Doukoure was an assistant manager because Sow and Doukoure told her that Doukoure was a department manager of electronics at the Bel Aire store.  (Plf.'s Dep. at 49, 79.)  Plaintiff does not recall telling Mr. Pidgeon about these pre-December 15, 2004 remarks.  (Plf.'s Dep. at 80.)  In his declaration, Mr. Pidgeon avers that Plaintiff did not do so.  (Pidgeon Decl. ¶ 7.)

## II.  Summary Judgment Standard

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  In evaluating a motion for summary judgment, the evidence must be viewed in the light most

favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Analysis

### A. Plaintiff's Sexual Harassment Claims

National raises several arguments addressing Plaintiff's claims of hostile environment sexual harassment, quid pro quo sexual harassment, and retaliation for reporting claims of sexual harassment. Each is addressed in turn.

### 1. Timeliness of Plaintiff's Pre-December 15, 2004 Sexual Harassment Claims

The parties do not dispute that Plaintiff's original charge of discrimination was timely filed or that the amended charge was filed outside the required 300-day period.[2] The issue presented here is whether the amended charge alleging pre-December 15, 2004 sexual harassment relates back to the original, timely-filed charge. The Court disagrees with National's failure to exhaust arguments.

Prior to filing this lawsuit on July 18, 2006, Plaintiff filed a charge of discrimination with the EEOC. On her March 22, 2005 intake questionnaire, Plaintiff checked off "sex" and "religion" as claims of employment discrimination. She also filed out a separate

---

[2]Plaintiff filed her Charge of Discrimination with the Michigan Department of Civil Rights and the EEOC on April 13, 2005. Under Title VII, charges of discrimination filed with the EEOC "shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1).

supplemental questionnaire with allegations that she was sexually harassed by Sow and Doukoure on December 15, 2004. There was no mention of sexual harassment preceding that date anywhere in Plaintiff's handwritten documents. (Plf.'s Ex. L.) A "Charge of Discrimination" was prepared on April 13, 2005 and signed by Plaintiff. It alleges that National unlawfully retaliated against Plaintiff for reporting the December 15, 2004 incidents of sexual harassment. (Plf.'s Ex. M.) It lists the earliest date that discrimination took place as December 15, 2004. (*Id.*) It provides the following commentary:

> I began working for the above-named company in November 2004. My current position held is a Customer Service Rep.
>
> On December 15, 2004, I filed an internal sexual harassment complaint against a coworker and the Store Manager. The complaint was investigated and the coworker was transferred; however, the Store Manager was not disciplined and his behavior toward me changed. Specifically, he would tell other managers to watch me.
>
> On March 4, 2005, I met with Store Manager regarding his poor treatment of me. During the meeting, I mentioned that he was treating me unfairly due to me filing a complaint. He got made and stated "I run this store, forget corporate." Subsequently, he told me that I was suspended until further notice.
>
> I can only conclude that I am being subjected to retaliation for filing an internal sexual harassment complaint, in violation of Title VII of the Civil Rights Act of 1964, as amended.

(Plf.'s Ex. M.) Plaintiff signed this, affirming that she read the above charge and that it is true to the best of her knowledge, information and belief. (*Id.*) There is no notice of alleged sexual harassment by Doukoure before December 15, 2004.

Approximately seven months later, on November 4, 2005, Plaintiff amended her charge to include sexual harassment discrimination claims. (Plf.'s Ex. O.) Specifically, Plaintiff added a claim that sexual harassment by Doukoure began on November 15, 2005. She also added a claim of religious discrimination alleging that Sow told Plaintiff in January

2005 that she had to choose between "my God or my job;" and when she chose to attend church, she was written-up. (*Id.*)

The federal regulations implementing Title VII provide, in pertinent part, that:

> A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and <u>amendments alleging additional acts</u> which constitute unlawful employment practices <u>related to or growing out of the subject matter</u> of the original charge <u>will relate back</u> to the date the charge was first received. A charge that has been so amended shall not be required to be redeffered.

29 C.F.R. § 1601.12(b) (emphasis added). These regulations are to be liberally construed to give effect to Title VII's purpose and provisions. 29 C.F.R. § 1601.34.

The subject matter of Plaintiff's original Charge of Discrimination and her in-take questionnaire concerns Plaintiff's claims that she was sexually harassed by a coworker and the Store Manager beginning on December 15, 2004, and thus claims of sexual harassment against Sow and Doukoure arising from that December 15, 2004 incident asserted in Plaintiff's amended Charge of Discrimination relate back and are not untimely. The key issue here, however, is whether Plaintiff's amended claims that she was sexually harassed by Doukoure between November 15, 2004 and December 15, 2004 relate back. Applying the standard set forth in 29 C.F.R. § 1601.12(b), this Court concludes that they do because this conduct relates to or grows out of the subject matter addressed in her original charge.

### 2. Hostile Environment Sexual Harassment Claims

Hostile environment sexual harassment claims under Title VII and Michigan's ELCRA have some important differences. First, unlike Michigan's ELCRA, Title VII applies different standards for evaluating whether the employer as a whole is vicariously liable for the hostile

18

work environment," *Clark v. United Parcel Service, Inc.*, 400 F.3d 341, 349 (6th Cir. 2005). Under Michigan's ELCRA, the standard is not different for co-workers and supervisors. "[A]n employer may avoid liability . . . if it adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment." *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 916 (Mich. 2000). "Such prompt and appropriate remedial action will permit an employer to avoid liability if the plaintiff accuses either a co-worker . . . or a supervisor of sexual harassment." *Id.* (internal quotations and citations omitted). "An employer, of course, must have notice of alleged harassment before being held liable for not implementing action." *Id.* Moreover, under Michigan's ELCRA, "it is the plaintiff's burden to prove that the employer failed to take prompt and adequate remedial action upon reasonable notice of the creation of a hostile environment, even where the harassing conduct is committed by a supervisor." *Id.* at 918. "[T]he relevant inquiry concerning the adequacy of the employer's remedial action is whether the action reasonably served to prevent future harassment of the plaintiff." *Id.* at 919.

### a. National's Response to Doukoure Harassment

National argues that it cannot be held liable under Title VII or Michigan's ELCRA for Doukoure's alleged sexual harassment of Plaintiff because, after being apprised of his conduct, it took immediate corrective action that Plaintiff concedes was adequate. This Court agrees.

First, despite Plaintiff's arguments to the contrary, Doukoure is her co-worker; not her supervisor. It is undisputed that, during the relevant time period, Issouf Doukoure was a stock employee with no authority to hire, fire, or discipline other employees. (Pidgeon Decl. ¶ 8; Pidgeon Dep. at 36; Allen Dep. at 22-24; Doukoure Dep. 11, 21-22.) Plaintiff's

mistaken belief otherwise does not change that fact. Sow was Plaintiff's supervisor; not Doukoure.

Because Doukoure was a co-worker, National is liable under Title VII "if it knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action." *Clark*, 400 F.3d at 348 (internal quotations and citations omitted). Plaintiff testified that Doukoure's sexual comments began about a month after she was hired; that is, around December 8, 2004 and culminated in the alleged touching and comments that occurred on December 15, 2004. Her amended Charge of Discrimination alleges that these comments occurred during a one-month time period beginning on November 15, 2004. (Plf.'s Ex. N.) Assuming for the purposes of this motion only that Plaintiff's allegations about Doukoure are true, Plaintiff cannot establish vicarious liability based on Doukoure's conduct.

National's anti-harassment policy includes a procedure for employees to report alleged violations to National's Director of Human Resources or any other management official with whom the employee feels comfortable. The policy provides, in pertinent part, that:

> Anyone who feels that he or she has been subjected to conduct which violates this policy or who has observed or learned of such misconduct should immediately report the matter to the Director of Human Resources, Robert Pidgeon – 516-489-3300 Ext. 1048 or Rosemary Wagner – 516-489-3300 Ext. 1003 or any other management official of the company with whom you feel comfortable. After business hours, you may call Robert Pidgeon at home, 516-735-1190, or you may call his cell phone number, 516-851-9725. If you are unsure of whom to raise an issue of harassment, or if you have not received a satisfactory response within five (5) business days after reporting any incident of what you perceive to be harassment, please immediately contact our President, Scott Rosen, who will insure that an investigation is immediately conducted. All reports of harassment will be handled as confidentially as possible.

(Ex. A, Pidgeon Decl.)

Plaintiff testified that, as to the pre-December 15, 2004 sexual comments by co-worker Doukoure, one was witnessed by Nicole Pye, whom Plaintiff described as a friend and front-end manager at the Bel Aire store. She then complained to Assistant Manager Tracey Childress. (Plf.'s Dep. at 76-77.) Plaintiff testified that Mr. Childress appeared shocked but told Plaintiff that "if I take a write-up to Ishmail [Sow], you already know he's not going to do nothing, and, basically saying that's because . . . Tracey is a manager and [Sow] pulls higher rank and the only person that can write [Doukoure] up is [Sow] and [Sow] is not going to do that." (Plf.'s Dep. at 78-79.) Plaintiff did not contact Mr. Pidgeon or anyone else listed in National's employment book before the December 15, 2004 touching incident. She testified that she "did not know" if she told Mr. Pidgeon about these pre-December 15, 2004 sexual comments when she reported the December 15, 2004 incident to him. (Plf.'s Dep. at 80.) Mr. Pidgeon avers that she did not. (Pidgeon Decl. ¶ 7.) Viewing this evidence in the light most favorable to Plaintiff, it cannot be said that National knew or should have known of this alleged pre-December 15, 2004 sexual harassment and failed to implement prompt and appropriate corrective action.

In contrast, as shown by Plaintiff's deposition testimony, after the December 15, 2004 incident occurred with Doukoure, she immediately reported it to both Store Manager Sow and Mr. Pidgeon. Mr. Pidgeon asked Plaintiff what she wanted him to do, and Plaintiff told him that she did not want to work with Doukoure anymore. (Plf.'s Dep. at 70-74.) National's response was prompt. Mr. Pidgeon told Store Manager Sow that Doukoure was not to work at the store while the investigation of Plaintiff's sexual harassment claim was pending. After Plaintiff told Pidgeon that she did not want to be transferred from the Bel

Aire store because it was closer to her home, Doukoure was transferred and told to stay away from the Bel Aire store. There is no evidence that he disobeyed those orders. Mr. Pidgeon also granted Plaintiff's request that she be given a few days off work. (Pidgeon Dep. at 22-25; Plf.'s Dep. at 70-74.) At the conclusion of National's investigation, Doukoure's transfer to the Northland store was made permanent, and Plaintiff's sexual harassment allegations were recorded in his personnel file. (Pidgeon Dep. at 52-54.) Mr. Pidgeon also advised Plaintiff to contact him if she had any more difficulties working at the Bel Aire store. After Doukoure's transfer, Plaintiff did not report to Pidgeon any additional claims of harassment, discrimination, or retaliation. (Pidgeon Decl. ¶ 9.) Plaintiff testified that, after Doukoure's transfer, she spoke with a police detective following up on her earlier police report arising from the December 15, 2004 incident. She told the detective that she did not feel threatened any more because National had transferred Doukoure to another store. (Plf.'s Dep. at 21.) Accordingly, because Plaintiff cannot establish vicarious liability against National based on co-worker Doukoure's conduct, her Title VII and Michigan ELCRA claims of hostile environment sexual harassment by co-worker Doukoure are dismissed.

**b. Hostile Environment Sexual Harassment Claims against Sow**

It is undisputed that Store Manager Sow was Plaintiff's supervisor. Under Title VII, because this alleged harasser is Plaintiff's supervisor, there is a different standard for determining whether National can be held vicariously liable for the alleged hostile work environment. "'[A]n employer *is* vicariously liable for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee.'" *Clark*, 400 F.3d at 348 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S.

742, 765 (1998)).  Moreover, if the harassment does not result in a negative tangible employment action for the victim, the employer can assert an affirmative defense showing that (a) it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* (internal quotations and citations omitted).  "No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Burlington Indus.*, 524 U.S. at 765.

Plaintiff alleges that, because supervisor Sow's sexual harassment resulted in her termination, National cannot assert an affirmative defense to her hostile environment sexual harassment claim. *Burlington Indus.*, 524 U.S. at 765.  National's motion does not dispute this.  Rather, it argues that Plaintiff cannot establish an essential element of her hostile environment sexual harassment claim under Title VII or Michigan's ELCRA.  Specifically, National argues that Plaintiff cannot show that supervisor Sow's conduct was sufficiently severe or pervasive enough to alter the conditions of the her employment so as to create an abusive working environment.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Chambers*, 614 N.W.2d at 915.

This determination is made by considering the totality of the circumstances. *Williams v. General Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999).  "Among the factors to be considered are 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Clark*, 400 F.3d at 351

(quoting *Harris*, 510 U.S. at 23). "The harassment should be ongoing, rather than a set of isolated or sporadic incidents." *Id.* "The plaintiff must show that the working environment was both objectively and subjectively hostile." *Id.*

Taking Plaintiff's allegations as true for the purposes of this motion, this Court agrees with National that supervisor Sow's sexually harassing comments to Plaintiff on December 15, 2004 fall short of constituting legally actionable harassment. There is only one occasion where Sow allegedly commented to Plaintiff that "[y]our man can't handle all of that ass" and that she "needed to come to their hotel" because she "can't do one without doing the other." (Plf.'s Dep. at 66.) Plaintiff believed Sow to be referring to Doukoure. While these comments are offensive and humiliating, they are not physically threatening, severe or part of ongoing harassing comments by Sow. Moreover, Plaintiff does not allege that Sow's comments on December 15, 2004 unreasonably interfered with her ability to perform her job. Finally, other than her factually unsupported speculation, Plaintiff presents no evidence that Sow knew of and ignored, or should have known of and ignored Doukoure's sexual comments to her that allegedly occurred in the month before the December 15, 2004 incident. Accordingly, Plaintiff's Title VII and Michigan ELCRA claims of hostile environment sexual harassment are dismissed.

### 3.  Quid Pro Quo Sexual Harassment Claims

The Supreme Court has observed the differences between quid pro quo and hostile environment sexual harassment claims:

> Cases based on threats [to retaliate against an employee if she denied a sexual advance] which are carried out are referred to as *quid pro quo* cases, as distinct from bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment. The terms *quid pro quo* and hostile work environment are helpful, perhaps in making a rough demarcation

between cases in which threats are carried out and those where they are not or are absent altogether, but beyond this they are of limited utility.

* * *

We do not suggest the terms *quid pro quo* and hostile work environment are irrelevant to Title VII litigation. . . . When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII. For any sexual harassment preceding the employment decision to be actionable, however, the conduct must be severe or pervasive. . . .

*Burlington Indus.*, 524 U.S. at 751, 753-54. Michigan law draws a similar distinction. *See Chambers*, 614 N.W.2d at 916.

There is no evidence that either co-worker Doukoure or supervisor Sow made and carried out any threats to Plaintiff that they would retaliate against her if she denied a sexual advance. Accordingly, Plaintiff's *quid pro quo* claims under Title VII and Michigan's ELCRA are dismissed.

### 4. Retaliation Claims

Plaintiff alleges that she was terminated in late January or early February 2005 because she reported to Pidgeon that Doukoure and Sow sexually harassed her on December 15, 2004. Plaintiff does not and cannot allege that Doukoure retaliated against her. It is undisputed that he had no authority to hire, fire, or discipline Plaintiff. Accordingly, Plaintiff's retaliation claims can be attributed solely to Sow's conduct.

To establish her claim of retaliation under Title VII or the ELCRA, Plaintiff may use either direct or circumstantial evidence. Direct evidence is that which, if believed, requires the conclusion, without inference, that unlawful discrimination was at least a motivating factor in the employer's action. *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381-82

(6th Cir. 2002); *Jacklyn v. Shering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Plaintiff offers no direct evidence of retaliation and thus must establish a circumstantial case of retaliation.

To establish a claim of retaliation, Plaintiff must show that (1) she was engaged in a protected activity; (2) National knew that Plaintiff did so; (3) National thereafter took an adverse employment action against her; and (4) there was a causal connection between the protected activity and the adverse employment action. *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000). If Plaintiff establishes a prima facie case of retaliation, National must articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 793. Because the Plaintiff bears the burden of persuasion throughout, she must then show that National's proffered reason for the adverse employment decision was a pretext for retaliation.

National first argues that Plaintiff cannot establish the causal element of her prima facie case because it is based solely on the temporal proximity between her protected activity and her termination. As recently observed by the United States District Court for the Eastern District of Tennessee, there is some confusion in Sixth Circuit case law on this issue. *Eppes v. Enterprise Rent-A-Car Co. of Tenn.*, No. 3:05-CV-458, 2007 WL 1170741, *7 (E.D. Tenn. April 18, 2007) (comparing *Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir. 2000) (where the Court discussed its earlier decisions finding "a causal connection when the temporal proximity was considered along with other evidence of retaliatory conduct" and concluding that temporal proximity alone is generally insufficient to raise an inference of retaliation) with *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (observing that "this Circuit has embraced the premise that in certain distinct cases where

the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise") and *Asmo v. Keane, Inc.* 471 F.3d 588, 593-94 (6th Cir. 2006) (same)).  Here, as in *Eppes*, the Court finds that, because genuine issues of material fact also exist on the issue of pretext, those questions plus the close temporal proximity between her protected activity and her termination (about six weeks), are sufficient to establish her prima facie case.  *See Eppes*, 2007 WL 1170741 at *7.

Despite National's argument that Plaintiff cannot establish that National's legitimate, non-discriminatory reason for terminating her was a pretext for retaliation, genuine issues of material fact exist on this issue.  First, there is a dispute whether Plaintiff engaged in protected activity before or after her December 15, 2004 write-up.  Second, there is evidence that National provided shifting or changing rationales for Plaintiff's termination. *See Asmo*, 471 F.3d at 596.  In National's position letter to the EEOC, it stated that Plaintiff was terminated because she refused to work her scheduled hours.  (Plf.'s Ex. N, 8/16/05 letter at 8.)  Mr. Pidgeon testified that Plaintiff's termination was based on her inability to work on Sundays.  (Pidgeon Dep. at 44.)  Mr. Sow testified that Plaintiff was terminated because she repeatedly failed to follow store policies like not punching out before going to lunch, for leaving her work station when warned not to, and for not showing up for work when scheduled.  (Sow Dep. at 47.)   Third, there is a dispute whether Plaintiff's December 15, 2004; December 30, 2004; and January 30, 2005 write-ups have a basis in fact. Although National may be successful at trial when the jury assesses credibility, Plaintiff has presented sufficient evidence to defeat its motion for summary judgment on this claim.

**B. Claims of Religious Discrimination**

Plaintiff claims that National violated Title VII and Michigan's ELCRA when it discriminated against her because of her religion in two ways: (1) by failing to accommodate her religious beliefs; and (2) by terminating her because of her religious beliefs. National's motion argues that she cannot establish the essential elements of either claim. This Court agrees with National as to Plaintiff's religious accommodation claim. Genuine issues of material fact exist, however, on Plaintiff's religious discrimination claim.

**1. Religious Accommodation Claim**

As recently observed by the Sixth Circuit, "[t]he analysis of any religious accommodation case begins with the question of whether the employee has established a prima facie case of religious discrimination." *Tepper v. Potter*, ___ F.3d ___, ___, 2007 WL 2983156, *4 (6th Cir. Oct. 15, 2007). To establish a prima facie case, Plaintiff must show that: (1) she "holds a sincere religious belief that conflicts with an employment requirement;" (2) she informed National "about the conflicts;" and (3) she was "discharged or disciplined for failing to comply with the conflicting employment requirement." *Id.* (internal quotations and citations omitted).

This Court agrees with National that Plaintiff cannot establish the essential elements of this claim. First, Plaintiff has not shown how her religious beliefs conflict with National's request that she work some Sundays. It is undisputed that National was willing to schedule Plaintiff to work on Sundays after her church services. In fact, Plaintiff did so on two Sundays in December 2004. (Plf.'s Dep. at 46-47.) Rather, viewing the record in the light most favorable to Plaintiff, it is undisputed that she wanted her entire Sundays off for purely personal reasons.

28

At her deposition, Plaintiff testified to the following. When she hired in, she told Assistant Manager Keith Steward that she did not want to work on Sundays because that is when she goes to church and after that spends time with her family. (Plf.'s Dep. at 40-41.) On Saturday, January 29, 2005, she had a discussion with Sow and told him that the reason she wanted her Sundays off was to do homework for her GED. This was in response to Sow's suggestion that she come into work after her Sunday church services. (Plf.'s Dep. at 60-61.) On her last day at work, she told Sow that she had informed the Bel Aire store staff when she hired in that she did not work on Sundays because she goes to church, spends time with her family, and does her homework. (Plf.'s Dep. at 82-83.)

## 2. Religious Discrimination Claim

Plaintiff argues that she has direct evidence of religious discrimination in Sow's comment to her on her last day of work that "You need to choose between your God and who's going to pay your bills, your God or your job." (Plf.'s Dep. at 82-83.) "[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *DiCarlo*, 358 F.3d at 415 (internal quotations and citation omitted). Sow's alleged comment satisfies this definition. Moreover, it is undisputed that Sow had the authority to and did make the decision to terminate Plaintiff the same day he allegedly made this comment. Sow and Allen dispute that this or any other comment of its nature was ever made to Plaintiff. Accordingly, genuine issues of material fact exist for trial on Plaintiff's claim that she was terminated because of her religion.

## IV. Conclusion

For the above-stated reasons, Defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Plaintiff's sole remaining claims for trial consist of (1) retaliation attributed to supervisor Sow in connection with disciplinary action taken against Plaintiff beginning on December 15, 2004; and (2) intentional religious discrimination by supervisor Sow.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  November 29, 2007

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on November 29, 2007, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager